UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------x
                                          :
JANE DOE o/b/o A.M.[1]                     :          3:14 CV 1555 (JGM)
                                          :
V.                                        :
                                          :
CAROLYN W. COLVIN,                         :
ACTING COMMISSIONER OF                     :
SOCIAL SECURITY                            :          DATE: JANUARY 27, 2016
                                          :
---------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER AND DEFENDANT'S MOTION TO AFFIRM THE
DECISION OF THE COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff's minor child, A.M. ["AM"], Supplemental Security Income

["SSI"].

I.  ADMINISTRATIVE PROCEEDINGS

        On May 2, 2011, plaintiff applied for SSI on behalf of AM, alleging that AM has been

disabled since January 17, 2008 (see Certified Transcript of Administrative Proceedings,

dated January 6, 2015 ["Tr."] 121, 269-77),[2] due to attention-deficit hyperactivity disorder

["ADHD"], post-traumatic stress disorder ["PTSD"], mood swings, and emotional disorder.

(Tr. 108, 111, 300). Plaintiff's application was denied initially (Tr. 110, 122-24; see also Tr.

103-09), and upon reconsideration. (Tr. 121, 128-30; see also Tr. 111-20, 125-27). On

---

[1]In light of the nature of the claims made in this application, and in light of plaintiff's pro se
status, the Court is referring to plaintiff as Jane Doe, and her daughter by only her first and last
initials, to protect her identity.  Cf. FED. R. CIV. P. 5.2(a)(3), 5.2(c)(2)(B), 5.2(e)(1).

[2]The record also contains a previous application for SSI benefits filed on May 26, 2010 and
alleging an onset date of May 12, 2010. (Tr. 262-68).

December 28, 2011, plaintiff filed a request for a hearing by an Administrative Law Judge

["ALJ"](Tr. 131-33), and on November 13, 2012, and July 2, 2013, hearings were held before

ALJ Bruce Zwecker;[3] AM testified at the first hearing, her mother testified at both hearings,

and psychological expert Billings Fuess, PhD, testified at the second hearing by telephone.

(Tr. 58-80, 81-102; see also Tr. 134-41, 152-69, 176-261).[4] On July 15, 2013, ALJ Zwecker

issued an unfavorable decision finding that AM did not qualify for SSI benefits. (Tr. 13-35).

On September 9, 2013, plaintiff requested a review of the hearing decision (Tr. 6-10; see

also Tr. 468-70), which the Appeals Council denied on September 25, 2014,[5] thereby

rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On October 21, 2014, plaintiff commenced this action on AM's behalf (Dkt. #1),[6] and

on January 23, 2015, defendant filed her answer. (Dkt. #10).[7] On March 23, 2015, plaintiff

filed her Motion for Order Reversing the Decision of the Commissioner and brief in support

---

[3]On August 24, 2012, plaintiff attended a pre-hearing conference with Sally Rogers, a senior attorney with the Social Security Administration. (Tr. 43-57).

[4]Dr. Donald Samson briefly questioned plaintiff at the first hearing, but because he had not reviewed new material that was submitted at the hearing, the ALJ did not take his testimony at that time. (Tr. 62-63, 77-79).

In addition to the material submitted at the hearing, on June 27, 2013, plaintiff also submitted a letter to ALJ Zwecker which purportedly included a copy of case law with precedential value, a copy of a medical summary of AM, a referral to the Intensive In-Home Child and Adolescent Psychiatric Services ["IICAPS"], AM's medication list, copies of emails between Pamela Halstead and plaintiff, and "examples of disturbing behaviors and action in the home[.]" (Tr. 466).

[5]In this request for review, plaintiff included an undated letter from Ephraim P. Bartfield, MD, and a letter from Nancy Dicnizio, LPC, dated August 29, 2013, discussing AM's limitations. (Tr. 11-12, 41-42). However, the Appeals Council found that these letters did not meet the criteria for reconsideration pursuant to 20 C.F.R. § 405.401(c). (Tr. 2).

[6]On the same day, plaintiff filed a Motion for Leave to Proceed In Forma Pauperis (Dkt. #2), which was granted the next day. (Dkt. #5).

[7]Attached to defendant's Answer is the certified administrative transcript, dated January 6, 2015. (See also Dkt. #15). There is some duplication in the record.

(Dkt. #13), which was followed by defendant's Motion to Affirm the Decision of the Commissioner and brief in support on May 21, 2015 (Dkt. #14), and plaintiff's reply brief on June 9, 2015. (Dkt. #17).[8]

For the reasons stated below, plaintiff's Motion for Order Reversing the Commissioner's Decision (Dkt. #13) is **denied**, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #14) is **granted**.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

AM was nine years old at the time of the hearing and testified that she lives with her mother and two siblings. (Tr. 64-65). She attends elementary school where she "tr[ies] to be friendly[,]" likes her teacher, and likes all of her classroom subjects, especially reading. (Tr. 65-68). AM testified that she is a good student and has friends with whom she will "play outside sometimes[,]" but she does not go over to her friends' houses and they do not come to her house; she also plays with her sister, with whom she shares a bedroom, but she sometimes fights with her siblings. (Tr. 67-68). She testified that she sometimes stays up late to play, sometimes feels tired when she wakes up and when she is at school, sometimes gets in trouble at school and loses her reading log, but has never been sent to the principal's office. (Tr. 68-69).

Plaintiff elaborated on AM's testimony to explain that AM has more than one teacher, has a paraprofessional in the classroom and outside of the classroom, sees the school psychologist for thirty minutes per week, and is removed from the classroom for academic

---

[8]Plaintiff was informed of her right to counsel (Tr. 190; see also Tr. 43-57), but has represented herself throughout these proceedings. (See Tr. 61-62).   Her verbal and written advocacy for her daughter were on par with, or even exceed, some attorneys.

help and help with her social behavior; she is unable to independently socialize with her peers and requires adult supervision. (Tr. 70, 75). Plaintiff testified that AM takes Concerta and had previously taken additional medications that left her too "groggy" in the morning;[9] however, plaintiff claimed that AM's medicine often wears off in the evening which causes her to have more energy and leads to conflicts with her siblings that sometime turn physical. (Tr. 70-71, 75-76). Plaintiff explained that AM would often stay up late into the night because she was scared of her brother coming into her room and that she will fall asleep earlier if she sleeps with her mother. (Tr. 71, 76).

Plaintiff testified that AM has been diagnosed with mood disorders, ADHD, and PTSD,[10] and that she will have extreme and sudden mood swings over mundane issues. (Tr. 71-73). Also, while AM is friendly with everyone, a trait which sometimes causes her to act inappropriately affectionate towards strangers (Tr. 72, 75), she has problems with making and keeping friends, an issue for which she is receiving treatment with both her school therapist and a therapist she sees every Saturday. (Tr. 72).[11] She is not allowed to attend sleepovers or have play dates because she may become physically aggressive. (Tr. 75). Elaborating on AM's behavior in school, plaintiff testified that AM is unable to stay on task even while taking her medication and has issues with "appropriateness[ and] appropriate

---

[9]Dr. Samson confirmed at the hearing that AM's only current medication was Concerta/Metadate but that she had previously taken Risperidone/Risperdal, and Tenex/Intuniv. (Tr. 77-78).  As discussed in this ruling, she also was prescribed Melatonin and Abilify.

[10]The PTSD is related to AM experiencing inappropriate sexual behavior by a close relative with whom she resides and witnessing domestic violence between her parents. (Tr. 73). AM's history with inappropriate sexual behavior is summarized in a January 17, 2008 Child Abuse Consult (Tr. 616-18) and in a series of reports from the Department of Children and Families. (Tr. 620-23, 642-53).

[11]Plaintiff explained that AM previously received treatment in an extended day treatment ["EDT"] program but ceased attending this program because of transportation issues. (Tr. 72-73).

demeanor[.]"  (Tr. 73). She also receives assistance on standardized testing and "in all academic areas, especially in reading and math which [are] areas in which she scored significantly low." (Tr. 74). AM also has difficulty focusing, which negatively impacts both her academics and her social interactions (Tr. 75), and has a tendency to treat her toy dolls like real people, which plaintiff feels is inappropriate behavior for a child of her age.  (Tr. 77).

A second, supplemental hearing was held on July 2, 2013, at which plaintiff and psychological expert Billings Fuess, PhD, testified. (Tr. 81-102). Plaintiff explained that since the last hearing, AM had been prescribed Risperdal to treat her mood disorder but that there had not been much improvement and she was still having difficulties at home and in school. (Tr. 88-89). She testified that AM's behavior in school was still "very, very inappropriate" and often resulted in her being separated from her classmates. (Id.). AM still had tantrums and would bite pieces out of her bed's headboard at night when she could not sleep. (Id.; see also Tr. 459-61). Plaintiff testified that AM continued to experience distorted thinking and had told the school nurse that her mother beat her, a false accusation which triggered an investigation by the Department of Children and Families. (Id.).[12] AM also continued to change the subject when confronted with topics which made her feel uncomfortable. (Id.).

Dr. Fuess, a clinical psychologist who specializes in treating children and adolescents (Tr. 90), testified that the record supported a diagnosis of attention deficit disorder and ADHD, and contained diagnoses of mood disorder and PTSD, but that none of these impairments either met or medically equaled a listing. (Tr. 92). Despite her teacher's notes highlighting a number of obvious problems with AM's learning abilities, including a serious problem with expressing ideas in written form, Dr. Fuess rated AM's impairments in acquiring

---

[12]Plaintiff clarified that AM had received a "spanking" but was not "beaten." (Tr. 89-90).

and using information to be less than marked because her IQ scores fell in the low average to borderline range. (Tr. 92-93). Similarly, while AM's teacher noted problems with her ability to attend and complete tasks, including obvious problems working without distracting herself, Dr. Fuess found her to have less than marked impairments in attending and completing tasks because of her results on tests measuring her working memory and processing speed. (Tr. 93-94). Dr. Fuess found that AM had marked limitations in her ability to interact and relate with others based off of plaintiff's testimony, her school scores, and reports of her inappropriate behavior with her peers. (Tr. 94-95).[13] Dr. Fuess also determined that despite difficulty regulating her emotions, AM had less than marked limitations in caring for herself but that she had no limitations in moving about and manipulating objects, or in her health and physical well-being. (Tr. 95-96).

Plaintiff challenged Dr. Fuess' opinion that AM had a less than marked impairment in her ability to care for herself, highlighting the additional care she requires, the reports documenting AM's difficulties in completing tasks, and emotional issues despite increases in her medication. (Tr. 96-99). Plaintiff believed that the same issues which led Dr. Fuess to determine that AM had a marked impairment in interacting and relating with others reflected marked limitations in other categories as well. (Tr. 99-101). However, Dr. Fuess responded that this information did not change his opinion because he had considered these factors when forming his opinion. (Tr. 97, 99).[14]

---

[13]In an interrogatory completed before the hearing, Dr. Fuess determined that AM had less than marked limitations in interacting and relating with others; however, based on the evidence he learned at the hearing, he modified his opinion about this category. (Tr. 94-95).

[14]In addition to the hearing testimony, the administrative transcript includes an unsigned, undated, and incomplete recitation and analysis of AM's limitations (Tr. 657-62), which lists its source as a local youth services agency but is presumably written by plaintiff (Tr. 657 ("I have trouble with her sleeping[,]" but "she sleeps fine when she sleeps with me.")), as well as a May 12,

B. EDUCATIONAL RECORDS

On October 3, 2008, Robert W. Metz, MEd, administered an Intellectual and Behavioral Assessment to analyze AM's cognitive, emotional, and behavioral skills. (Tr. 340-45). This testing showed that AM was in the "low average" range for her Verbal Intelligence Quotient, Performance Intelligent Quotient, and Processing Speed Quotient (Tr. 341); her teacher and mother also reported that her behavior was "clinically significant" or "at risk" in multiple categories, including, inter alia, hyperactivity, aggression, anxiety, depression, atypicality, and maintaining attention. (Tr. 342-44). She had significant weaknesses in her ability to demonstrate practical information and with her verbal comprehension and reasoning skills. (Tr. 344). Two weeks later, on October 16, 2008, AM's school determined that her academic skills were "typical for a child who has just entered her kindergarten year[]" and that her language arts and math skills were in the average range. (Tr. 346-47).

On May 26, 2011, plaintiff met telephonically with AM's Planning and Placement Team ["PPT"], consisting of AM's primary teacher, special education teacher, and school psychologist. (Tr. 308-26; see also Tr. 348-66). They determined that during the 2011-2012 school year AM would receive three hours per week of language arts support, one hour per week of math support, two hours per week of writing support, thirty counseling sessions per year, and assistance on standardized testing. (Tr. 309; see also Tr. 323, 325, 349). They also identified numerous categories in which AM's abilities were age appropriate, but noted that her language arts skills were below grade level expectations, that her behavioral/social/emotional skills were hampered by her difficulties with mood regulation and impulsivity, and that she became easily distracted by her emotions (Tr. 311-12; see also Tr.

---

2011 function report (Tr. 285-96) and a June 9, 2012 activities of daily living form (385-87), both completed by plaintiff and both largely consistent with her testimony at the hearing.

351-52); they set a number of goals to help AM improve her reading, writing, math, and social skills. (Tr. 314-22; see also Tr. 354-62).

On October 13, 2011, AM's PPT, this time consisting of plaintiff, the school principal, AM's regular and special education teachers, and two school psychologists, determined that because of her ADHD, AM would continue to receive special education of one hour per week for math, one hour per week for written language, informal assistance with reading, thirty counseling sessions per year, and accommodations on her standardized testing. (Tr. 402-04, 406; see also Tr. 420). AM's regular education teacher, Michelle LeVasseur, described AM as a "sweet girl in class[]" and explained that she was "working on appropriate things to talk about with others[;]" also, while AM was still behind in her academics and hindered by her inability to stay on task, she was "continuing to make good progress." (Tr. 403; see also Tr. 408 (lack of focus negatively impacted her math and reading performances)). The PPT found that AM was "polite, kind and interested in connecting with peers and adults[,]" but that she had "difficulty managing her feelings and emotions to be able to complete classroom tasks and relate appropriately to peers[,]" had "overly-emotional reactions to benign events within the school environment[,]" had "trouble maintaining on-task behaviors[,]" and would discuss "topics that [were] inappropriate for her peer group and setting[]" (Tr. 409); they set new goals for AM to improve her writing, math, and social skills. (Tr. 411-16). The same day, the school completed a triennial evaluation of AM which showed that she had achieved test scores that were in the average range, with her highest scores in "associational fluency in the Oral Fluency composite as well as phonological awareness in the sound symbol composite[,]" and her lowest scores in "oral expression and math computation." (Tr. 422-25).

On October 16, 2012, after plaintiff had switched schools during the third grade, Pamela Halstead, MA, her new school psychologist, explained that AM had been kept in

special education classes, was receiving five hours per week of language arts support, one hour per week of math instruction, two and a half hours per week of academic support, thirty minutes of counseling per week, and ten hours per week of academic support in every four day cycle; AM also qualified for summer school and continued to receive accommodations on standardized tests. (Tr. 428). She was making progress socially, making friends,[15] and beginning to put her concerns into words, but she still had "overly emotional reactions to benign events in school, still ha[d] to be reminded not to discuss topics that are inappropriate for the school counseling setting[,]" and Halstead still set goals for AM to improve her social interactions. (Tr. 428-30).

On March 11, 2013, Halstead informed plaintiff that AM had an imaginary friend who she insisted was real, that she had been telling her classmates that she was a werewolf or witch,[16] and that she believed that people were following her but that these people would disappear when she turned around to look at them. (Tr. 446). On May 21, 2013, Halstead informed plaintiff that AM had been chasing boys at recess after they asked her to stop, putting her arms around boys in class, waving at boys in the cafeteria, and, when confronted with these behaviors, would say that she was a teenager and could not help it. (Tr. 447).[17] Halstead also revealed that AM has a fascination with blood, has threatened to "suck all of

---

[15]Plaintiff denies that AM made any friends and insists that the friends referenced by Halstead would be more accurately described as acquaintances. (Tr. 437). Plaintiff claims that AM has "yet to form any lasting relationships with peers her age," and that most of her "friends" are younger than her. (Id.). AM reportedly alienates even younger children with her immaturity and is unable to "go on play dates, play sports, or enjoy sleepovers because of her moods, hyperactivity and impulsiveness." (Id.).

[16]On June 20, 2013, it was noted that AM had been asked by the school to stop making these statements but she continued to do so. (Tr. 683-84).

[17]Halstead also referenced that AM used to wear clothes that were not age appropriate but thanked plaintiff for now dressing her in more modest clothing. (Tr. 447).

the blood out of [a classmate,]" talks about blood, picks her scabs until they bleed, and once bit her lip until it bled and then put bloody fingerprints on her paper. (Id.). Despite these issues, Halstead noted that AM was doing well with "most of her schoolwork." (Id.). In response to these concerns, plaintiff promised to talk to AM about boys and noted that she had already been concerned about AM's "future relationships with males." (Tr. 448).

On June 7, 2013, plaintiff wrote to Halstead that she decided to have AM examined by a psychiatrist, after plaintiff was made aware of "the additional behaviors escalating in school[,]" and because AM was "getting to be a little too much for [plaintiff] to handle[.]" (Tr. 450). Plaintiff requested that Halstead and AM's regular and special education teachers all write a report describing their concerns with AM's behavior to be shared with the psychiatrist. (Tr. 450). Halstead agreed to create this report and on June 12, 2013, informed plaintiff that she was gathering these reports and requested, and later received, plaintiff's permission for the psychiatrist to share information with her. (Tr. 451, 457). On June 17, 2013, Halstead sent plaintiff her observations of AM and summarized her concerns about AM's imaginary friend, her claims to be a witch or werewolf, her belief that people were following her, her behavior with boys in her class, her fascination with blood, and her history of inappropriate dress. (Tr. 453-55).[18] Halstead also included that AM is friendly, well groomed, well nourished, sweet, and hardworking, but that she does not know how to approach other children, is inattentive, and that her attention difficulties impact her learning. (Tr. 453). While AM insisted that her imaginary friend was real, she understood that her dolls were not real. (Tr. 454). Halstead reported that in March of 2013, AM turned in an assignment with her name misspelled and some of the words and numbers upside down (Tr.

---

[18]The copy of Halstead's observations is incomplete and ends abruptly in the middle of a sentence. (Tr. 455).

454-55; see also Tr. 456), and that on June 14, 2013, AM told the school nurse "that her mother had hit her and that she had 'scars'" and that "she was hitting her head against a mirror to wake herself up" because she was so tired. (Tr. 455).[19]

The administrative record also contains photographs of AM's bed that show bite marks made by AM and drawings and letters in which AM drew herself enchained or deceased with angel wings, devil horns, and a tail, and referring to herself as "sa[]tan's ang[el][.]" (Tr. 458-65). The drawings and letters express dissatisfaction with her mother (Tr. 462-65), which plaintiff claims is because AM is required to do chores, is unable to have sleepovers like her sister, is not always allowed to sleep with her mother, and is sometimes disciplined. (Tr. 458).

C. MEDICAL RECORDS

On November 3, 2008, plaintiff was seen at the Community Mental Health Affiliates, because of her difficulty following directions, hyperactivity, mood swings, disruptive behavior in school, difficulty focusing, and physical aggression. (Tr. 471-73). AM had started to receive youth counseling services four weeks prior to this appointment and it was recommended that she be evaluated by a psychiatrist and begin additional counseling services. (Tr. 473).

On February 9, 2009, Wayne Cotton, DO, completed a Psychiatric Assessment of AM because of her reported aggression, insomnia, tantrums, and frequent mood swings. (Tr. 482-85). Dr. Cotton recounted that AM's behavioral problems reportedly began when she was four years old and include impulsivity and an inability to focus at school which requires her to have one on one supervision; he noted that earlier that day, AM had been suspended from school for stabbing another child in the back with a pencil. (Tr. 482). Although AM had

---

[19] See note 12 supra.

previously taken Melatonin to help her sleep, which was initially effective but had become less so over time, at the time of the assessment, AM was not taking any medication. (Tr. 483). Despite observing AM's severe motor restlessness, including her crawling under chairs and tables, Dr. Cotton found AM had good eye contact, clear speech, goal directed thought process, and that she was academically on or above her grade level, as reflected in her knowledge of all of her letters and her ability to write her name perfectly; he diagnosed her with inattention, poor impulse control/aggression, combined type ADHD, and stuttering, and decided to prescribe medication. (Tr. 483-84). Dr. Cotton altered AM's medications on February 23, 2009, after plaintiff reported that the current medications were not helping (Tr. 475, 480), and on April 7, 2009, he noted that plaintiff had been administering the medications incorrectly and prescribed a lower dose to be taken more frequently throughout the day to help prevent it from wearing off. (Tr. 476; see also Tr. 475-81).

After being treated at the Community Mental Health Affiliates since November 3, 2008, for difficulty following directions, hyperactivity, mood swings, physical aggressiveness, and problems focusing, AM was discharged on June 4, 2009. (Tr. 488). During the course of her treatment, AM was cooperative but also aggressive, moody, and hyper; however, after she began taking medication, these symptoms decreased and she was able to make progress towards her treatment goals. (Id.). The main obstacle to her treatment was her family's absence from treatment and unavailability to discuss her issues. (Id.).

On August 3, 2009, AM underwent an intake assessment at the Wheeler Clinic with an intake social worker and a psychiatrist (Tr. 513-22), at which time her mother expressed concern about AM's impulsivity, tantrums, habit of imitating a cat, mood swings, and inappropriate social boundaries with peers and adults, but also reported that AM's mood, behaviors, and capability to learn and focus improved when she was on medication. (Tr.

513). Plaintiff recounted that AM and her siblings were exposed to domestic violence between their mother and father for years and that AM would try to intervene and defuse the situation; the intake worker noted that this exposure to violence may have attributed to AM's behaviors, emotional instability, and her attachment to her mother. (Id.). Plaintiff reported that AM did not get along well with other children and that her peers avoided her due to her aggressive behaviors and mood swings; she reported that twice during the previous school year, AM had stabbed a fellow student with a pencil. (Tr. 516). Plaintiff had previously signed AM up for soccer but she would get overly excited and have difficulty maintaining her energy. (Id.). AM was diagnosed with mood disorder, ADHD by history, and rule out PTSD. (Tr. 521).

Due to concerns about AM's hyperactivity, sudden mood swings, and difficulty to manage in the home, Carrol Hyun, MSW, referred AM to David Winokur, MD, who on August 24, 2009, performed a psychiatric evaluation (Tr. 490-93), at which he reviewed AM's history of behavioral issues, her exposure to domestic violence as a young child, and the reported inappropriate sexual contact between AM and her older brother. (Tr. 490). Dr. Winokur noted that AM had continued problems with prolonged tantrums, bizarre behaviors such as acting as a cat, frequent nightmares, avoidance type symptoms, poor boundaries with strangers, difficulty separating from her mother and aunt, and that she had recently "put her foot through a French door[,]" and "broke[] many things in the house[;]" these behaviors were similar to those reported at her school where she had difficulty making friends due to her physical aggression. (Id.). AM had previously been diagnosed with ADHD and PTSD and prescribed medications which had proved partially effective but caused significant sedation and weight gain. (Id.). Dr. Winokur observed that AM had "some difficulty with her social

development as reported by [her] mother through school[,]" and diagnosed her with PTSD, rule out mood disorder, rule out disruptive behavior disorder, and rule out ADHD. (Tr. 492-93). He recommended continuing AM's Tenex prescription but replacing her Risperdal prescription with Abilify; he also suggested that she attend individual and family therapy to learn better ways to cope with her frustration. (Tr. 493).

On August 31, 2009, AM began to meet regularly with Laura Ann Kramer, APRN, to manage her medications. (Tr. 494-95). AM enjoyed her first session with Kramer because she played with toys and drew pictures, but she became more hyperactive and verbal as the session went on and she had difficulty staying on topic while verbally expressing her feelings; her mother reported feeling overwhelmed from having to manage all of her children on her own but was noted to be patient with her daughter. (Tr. 494-95). Kramer decided to continue AM's current medications. (Tr. 495). AM had another medication review with Kramer on September 28, 2009, during which she was "engaged and verbally expressive" but had "trouble focusing her thoughts and staying on topic." (Tr. 496-97). Kramer observed that AM had a good deal of energy during the session and spent most of the time playing a game with a sibling; at plaintiff's request, Kramer increased AM's dosage of Abilify because the current dosage showed no adverse side effects and some benefit. (Tr. 497).

At a November 24, 2009 medication management session (Tr. 498-500), AM was calm and able to focus on an activity and her mother reported that she had been doing well at home and school. (Tr. 498). However, Kramer also noted that AM had been going to bed late and getting up early due to nightmares, that her hyperactivity had increased, that she wet herself for the first time at school because she did not want to bother anyone, and that her hyperactivity has historically increased around the holidays. (Tr. 499). Kramer decided

to increase the dosage of Tenex and noted that Abilify had improved her mood and decreased her irritability. (Id.). On January 5, 2010, Kramer found that AM's Tenex prescription had a positive impact on her hyperactivity, impulsivity, and sleep. (Tr. 501-02). AM's mood had been "fairly even" and had been "evening and stabilizing" due to the Abilify; however, there was a fear that the drug was causing her to gain weight and Kramer decided to monitor this effect and consider a change in medication. (Tr. 502).[20]

On February 13, 2010, Hyun diagnosed AM with mood disorder NOS and ADHD, predominantly inattentive type. (Tr. 545). On February 19, 2010, plaintiff reported to Kramer that AM's behavior at home had improved and that she was doing well in school; however, AM had been experiencing a slight increase in nightmares about her biological father. (Tr. 504-05). Kramer considered changing AM's Abilify to another prescription because of her weight gain. (Tr. 505). On March 29, 2010, Kramer found that AM had impairments in her memory, attention, and concentration, and that she had poor judgment; plaintiff reported that AM was not sleeping well, was having increased trouble with reading and focusing, and that she was exhibiting some impulsivity in her behavior. (Tr. 506-07). Kramer opined that AM's increased temper was likely related to her lack of sleep. (Id.).

On March 19, 2010, AM was seen by Hyun due to continued complaints of emotional and behavioral issues such as scratching, throwing toys, throwing tantrums, mood swings, and difficulty controlling her anger. (Tr. 489). Plaintiff reported that AM had been doing better at home and school but Hyun still observed that AM had "difficulty remaining still and focused during the session as evidenced by her walking around the room and imitating the

---

[20]At this appointment, Kramer noted that, despite several attempts to schedule an appointment, she had not seen the family since November 2009 and that plaintiff had been difficult to reach and had missed several appointments without rescheduling. (Tr. 501). She considered discharging the family due to their inconsistent participation in treatment. (Id.).

sounds and behaviors of various animals." (Id.). On April 2, 2010, plaintiff still reported aggressive behaviors such as scratching, throwing toys, and tantrums, and that AM still suffered from mood swings and difficulty controlling her behavior. (Tr. 509).[21]

At a medication management session with Kramer on May 25, 2010, plaintiff reported that AM was still not sleeping, that she was more aggressive and frustrated, and that she had been hitting others. (Tr. 510). Despite the fact that AM's sleep had somewhat improved, Kramer still attributed AM's increased temper to lack of sleep; she hesitated to increase AM's dosage of Abilify because it was likely related to her increased appetite and considered an alternative prescription. (Tr. 512).[22] On August 17, 2010, AM was still having trouble sleeping and her mother reported that when she took AM off of her medications, her hyperactivity, impulsivity, and aggressive behaviors grew worse. (Tr. 536). AM had also started to eat non-edible objects and would request second servings of meals due to hunger but would then vomit the meals back up. (Id.).

On September 21, 2010, AM was still suffering from the same issues of, inter alia, difficulty sleeping, aggressive behavior, and eating problems (Tr. 533); Kramer decided to increase AM's prescription of Concerta because the lower dosage provided no benefits. (Tr. 535). On October 26, 2010, Kramer observed multiple symptoms of "attention, mood lability,

---

[21]Hyun noted that after this appointment she would no longer be involved in AM's treatment. (Tr. 509).

[22]Throughout her appointments with Kramer, AM was found to be alert, cooperative, younger than her stated age, clean, and neatly and casually dressed (Tr. 523, 526, 529, 533, 536, 539, 542); to be oriented to person, place, and time (Tr. 523, 526, 530, 534, 536, 539, 542); to have logical thought form (Tr. 523, 527, 534, 540; but see Tr. 530 (tangential thought form), 542 ("fairly logical for her age[]")); to have judgment and insight that was normally poor (Tr. 527, 530, 534, 537, 540, 543; but see Tr. 524 (fair insight and judgment), 530 (fair insight but poor judgment)); and to have impaired memory, attention, and concentration (Tr. 523, 526, 530, 534, 536, 542). Her mood was inconsistent throughout the sessions and varied between good (Tr. 523, 536), sad (Tr. 526, 529), irritable (Tr. 533), and "often labile and irritable to aggression." (Tr. 539).

16

impulsivity and aggression[,]" and noted that AM was "violen[t] with peers" and "still very hyper." (Tr. 529, 531). She prescribed Intuniv to help improve AM's sleep but chose not to increase her Concerta because it might have been causing "some sadness" in her mood; however, AM's school preferred the mood lability she was experiencing on Concerta to the impulsivity she had exhibited in the past. (Id.). On December 14, 2010, after noting that AM was having trouble making friends and often kept to herself, Kramer increased her dosage of Intuniv in order to help AM sleep and focus. (Tr. 526-28). On January 11, 2011, Kramer increased AM's dosage of Intuniv again because the effects wore off in the evening and AM would become more hyper. (Tr. 523, 525).

In May 2011, AM's mother and treatment team, consisting of Catherine Nguyen, BA, Kramer, Richard Miller, MD, Steven Spector, MD, and Steven Kukolla, LMFT, agreed to a treatment plan to address AM's diagnosed mood disorder, NOS and ADHD, predominantly inattentive type. (Tr. 546-50). At this time, plaintiff reported that AM still had emotional and behavioral difficulties including aggressive behavior, tantrums, and mood swings, and that she displayed inappropriate social boundaries and had difficulty getting along with and making friends with her peers. (Tr. 547-48).[23] On June 20, 2011, Kramer met with AM, who had not been on medications since she had changed therapists in February. (Tr. 566). AM's school psychologist reported that AM had trouble controlling her emotions and was aggressive; she also expressed concerns about AM treating a doll as if it were a real person. (Id.). Kramer, as she had done previously, diagnosed AM with mood disorder, NOS and ADHD, predominantly inattentive type, and restarted her Concerta prescription. (Tr. 567-68).

---

[23]A nearly identical treatment plan had been crafted the previous month except it had been created and signed by Siobhan Badeaux, MFT, and lacked the signatures of Nguyen and Dr. Spector. (Tr. 551-56).

On August 2, 2011, Kramer noted that despite a "significant difference" in AM's behavior when she took Concerta regularly, she was still having trouble sleeping and was quick to anger; Kramer increased AM's dosage of Intuniv to assist with her sleep. (Tr. 569-71).

On September 21, 2011, Patricia Cables, APRN, performed a psychiatric evaluation of AM after her referral to the Wheeler Clinic's Children's EDT program for her increased verbal and physical aggression, tantrums, and mood lability. (Tr. 573-77). After reviewing AM's history (Tr. 573-75), Cables interviewed AM and found her to have average intelligence and fair insight and judgment. (Tr. 575). Cables diagnosed AM with PTSD, ADHD, and a mood disorder, NOS (Tr. 576), but observed that during the interview, AM "kept her focus fairly well[,]" and "was not excessively overly physically overactive." (Tr. 575).[24] She recommended trying Intuniv again in the evenings and Melatonin before bed. (Tr. 576). AM was accepted into the EDT program and discharged from the Wheeler Clinic. (Tr. 578-80).

On October 5, 2011, Cables met with AM to manage her medications (Tr. 581-84); she noted that AM was "[v]ery bright[ and] good at reading and artwork[,]" but that she had been overactive a few days prior when she did not get her morning medication. (Tr. 581). AM's Concerta still wore off in the afternoon and AM's mother wondered whether AM's increased mood lability was caused by the Intuniv; plaintiff had not tried giving AM Melatonin before bed and she was still having trouble falling asleep. (Id.). Cables increased AM's Concerta dosage but not her Intuniv. (Tr. 583). Two weeks later, Cables noted that AM was often irrationally worried that she was in trouble or had upset her peers and that she often isolated herself at recess; AM also still had problems with inconsistent attention, focus, and

---

[24]At this initial meeting, AM discovered a baby doll at the office and continued to play with and show reluctance to leave this doll at future sessions. (Tr. 575, 581, 585-87). Cables noted that AM "[m]ay be confusing her fantasy play with dolls and reality of her family." (Tr. 587).

falling asleep. (Tr. 585-86).

On November 16, 2011, Cables reported that AM would still throw tantrums at home and that her older brother would sometimes pick on her and she would respond with anger or hitting. (Tr. 595-98). She had shown some inconsistent improvement in her ability to focus but her mother reported that at school AM was teased, still exhibited poor boundaries, was overly affectionate, acted in childish ways, and was often off task; she also chose to draw or write in a notebook instead of playing with her peers at recess. (Tr. 595). During the week prior to the appointment, AM had been "flattened, blunted, [and] quiet[,]" possibly because her mother was unintentionally giving her too high a dosage of Intuniv. (Id.). On November 29, 2011, Cables reviewed AM's school reports, which showed average intelligence but some weaknesses requiring special education and counseling; she also reviewed AM's behavioral check sheets, which showed that most days AM was earning "many if not most of her possible [thirty] 'points'" for good behavior, but that AM also had ADHD and mood issues, sometimes talked off topic, displayed poor boundaries, was less mature and more clingy than her peers, and would sometimes speak at other people rather than with them. (Tr. 599-602). She was still having trouble falling asleep but her mother had not yet tried giving her Melatonin. (Tr. 599). AM was still focused on dolls, discussed her imaginary friend "with details about how she looks and dresses[,]" and spontaneously hugged Cables without warning or asking. (Tr. 600-01). Cables decided not to change AM's medications, but, at plaintiff's suggestion, decided to test AM for autism. (Tr. 601).

At her December 14, 2011 medication management session with Cables (Tr. 603-06), AM showed an inconsistent, mild increase in sustained attention and no major tantrums. (Tr. 603). AM's mother informed Cables that she planned to move towns so she could be closer

to family members but hoped to keep AM in her EDT program. (Id.). AM still exhibited "quite poor" boundaries and was still having problems falling asleep; Cables again recommended Melatonin and decided to increase her Intuniv dosage in the evening. (Id.). She did not speak of her imaginary friend at this session but Cables observed that she "tends only to speak of them when [her] mom [is] not present." (Tr. 604). Cables felt that AM's poor boundaries could be a result of "her anxiety and reactivity with [her] brother[,]" and hoped that the increase in Intuniv would help. (Tr. 606). Before moving to a new town and changing treatment centers, AM met with Cables for a final time on January 11, 2012. (Tr. 607-10). Cables explained that AM had made "some nice improvement in the program re: sustained attention; being more on topic with her comments; and less oppositionality. No physical aggression; no tantrums[;]" however, she noted that her mother still reported that in the home, where AM's mood was most variable, she was quick to escalate situations to rudeness and tantrums. (Tr. 607, 610). Cables also found that AM had made "some slow social gains" while in treatment but still had issues with being less mature, less reciprocal, having few friends, preferring to socially isolate at school, and being off topic often; at the last appointment, AM showed better social boundaries by asking appropriately for a hug. (Tr. 607-08). On January 13, 2012, AM was discharged from the Wheeler Clinic (Tr. 612-14), at which time it was noted that she had "demonstrated slow improvements during her first two months of treatment in [the] program[,]" but that she continued to struggle with "sustaining attention and interrupting her peers[;]" it was recommended that she remain in an EDT program to continue to work on her social skills, emotional regulation, and utilization of appropriate coping skills. (Tr. 612). She had made moderate progress towards her treatment goals of appropriately identifying, verbalizing, and processing her feelings, identifying and

utilizing coping skills to manage her anger and mood, accepting limits and consequences without arguing or throwing a tantrum, behaving safely towards herself and others, participating in clinical groups while utilizing active listening skills and not participating in side conversations, and demonstrating an increased ability to sustain attention for ten minutes or longer during structured activities. (Tr. 613).

    <u>D. MEDICAL OPINIONS</u>

On August 24, 2009, Angela Orsini Garry, APRN, completed a Medical Questionnaire for Connecticut Disability Determination Services (Tr. 486-87), in which she stated that she first saw AM on June 8, 2007 for suspected sexual abuse and last saw her on July 27, 2009, at which time her mother reported that she was struggling a bit in school, but, when examined, AM appeared normal developmentally. (Tr. 486-87). Garry also noted that AM had been receiving mental health services "on and off" since she first saw her. (Tr. 487).[25]

On June 3, 2011, Katherine Brown, AM's school psychologist, completed a questionnaire assessing AM's overall functioning. (Tr. 327-37). She explained that AM was in regular classes in the second grade but received special education supports in language arts and math "in a pull-out group setting weekly." (Tr. 327-28). She opined that in the domain of acquiring and using information, AM had a very serious problem in providing organized oral explanations and adequate descriptions; a serious problem in comprehending oral instructions, reading and comprehending written material, understanding and participating in class discussions, and expressing ideas in written form; an obvious problem with understanding school and content vocabulary, comprehending and doing math problems, and applying problem-solving skills in class discussions; and a slight problem with

---

[25]On June 15, 2011, APRN Garry completed a medical questionnaire in which she noted that she had not seen AM since 2009 because her mother "never followed up[.]" (Tr. 557-58).

learning new material and recalling and applying previously learned material. (Tr. 328).[26]

She explained that in the domain of attending and completing tasks, AM had a very serious problem which occurred hourly with working without distracting herself or others; a serious problem which occurred hourly with refocusing to task when necessary; a serious problem which occurred daily with sustaining attention during play/sports, focusing long enough to finish assigned activities or tasks, refocusing to task when necessary, waiting to take turns, changing from one activity to another without being disruptive, organizing own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time; an obvious problem which occurred daily with paying attention when spoken to directly and carrying out multi-step instructions; and a slight problem which occurred daily with carrying out single step instructions. (Tr. 329). She observed that AM has "extreme difficulties focusing and remaining on task throughout the school day[,]" that she is "often impulsive in her responding to daily instructions as well as [she] appears distracted by internal thoughts[,]" and that her "mood fluctuates wildly which impacts her ability to participate in instruction without continual prompting, redirection and supports." (Tr. 330).

She opined that in the domain of interacting and relating to others, AM has a very serious problem which occurs hourly with seeking attention appropriately; a very serious problem which occurs daily with relating experiences and telling stories; a serious problem which occurs hourly with taking turns in a conversation; a serious problem which occurs daily with playing cooperatively with other children, making and keeping friends, asking permission appropriately, introducing and maintaining relevant and appropriate topics of conversation,

---

[26]One day prior, on June 2, 2011, Patricia Auber, a representative from AM's school, opined that AM was performing below average in reading, math, and written language. (Tr. 306-07).

and interpreting meanings of facial expression, body language, hints and sarcasm; a serious problem which occurs weekly with expressing anger appropriately; an obvious problem which occurs daily with following rules and using language appropriate to the situation and listener; an obvious problem which occurs weekly with respecting/obeying adults in authority; and a slight problem which occurs daily with using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. 331). She also observed that AM has been disciplined by being verbally redirected, placed in time out, or spoken to by school administrators, and that AM "appears to quickly decompensate in her behavior requiring significant supports at times (crying, yelling)[.]" (Id.).

Brown found that AM had no problems with moving about and manipulating objects but did have problems caring for herself, including a serious problem which occurs hourly with responding appropriately to changes in her own mood; a serious problem which occurs daily in calming herself when upset or overly excited and handling frustration appropriately; an obvious problem which occurs daily with being patient when necessary, using good judgment about personal safety, identifying and asserting emotional needs with an appropriate degree of independence, using appropriate coping skills to meet daily demands of her school environment, and knowing when to ask for help; a slight problem which occurs daily with avoiding dangerous circumstances; and no problem with taking care of her personal hygiene, caring for her physical needs, and cooperating in, or being responsible for, taking needed medications. (Tr. 332, 334). Brown also documented that AM has "significant changes in [her] mood, sometimes on an hourly basis requiring adult intervention to help her calm down and refocus." (Id.). In conclusion, Brown reported that AM has "difficulty focusing and attending in the school environment" and has "significant mood swings, sometimes

within minutes, which do not appear to be triggered by anything on a consistent basis." (Tr. 335). That same day, in a separate form, Brown opined that AM had "emotional issues that go beyond the diagnosis of ADHD. She has severe mood disregulation that affects her ability to appropriately interact with others." (Tr. 339).

On September 14, 2011, state agency psychologist, Warren Leib, PhD, reviewed AM's records and determined that she had no limitations with manipulating and moving about objects or with health and physical well-being, and that she had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself (Tr. 107; see also Tr. 103-09); he concluded that she was not disabled. (Tr. 108). Three months later, on December 21, 2011, a second state agency psychologist, Hedy Augenbraun, PhD, reviewed AM's files and reached the same conclusions. (Tr. 117-18; see also Tr. 111-20).

On September 22, 2011, AM's school psychologist, Rachel Mroz, MS, CAGS, completed a psychological evaluation of AM in which she noted that AM had made some progress with her behavioral issues but that she continued to have problems following directions, utilizing appropriate coping skills when upset, complying with teacher requests, and displaying impulsive behaviors; however, her performance on standardized tests, for which she received assistance in the form of a reader, revealed a math score that was only slightly below average and a reading score that was slightly above average. (Tr. 559-60). Mroz found that AM had rapid mood changes that could be "quite disruptive to her learning[,]" and that her impulsivity resulted in her not properly following instructions during testing, but that she was still persistent and determined to do well on the test, that she used a variety of problem solving techniques, and that she frequently smiled in response to praise

and was eager to play games after the testing was over. (Tr. 560). After administering numerous tests, Dr. Mroz found that AM's overall cognitive abilities fell in the average range, but that she committed some careless errors due to her attention issues, and that her difficulties with attention, concentration, and memory would affect her ability to follow directions and take notes. (Tr. 560-61). Despite these issues with attention and concentration, AM performed in the average range on a test which required her to maintain attention and concentration, leading Mroz to opine that AM was able "sustain and maintain attention when she is interested in the task at hand." (Tr. 562). AM's mother reported that AM has significant behavioral and emotional concerns and problems with anxiety, depression, becoming easily upset, loneliness, fear that she is not well liked, worries, irritability, and lack of self control and mood control. (Id.). AM's mother also reported "extremely elevated scores on the inattention, hyperactivity/impulsivity, aggression, executive functioning, and learning problem scales." (Tr. 563). In summary, Mroz found that AM had average cognitive processing abilities across all domains but significant difficulties with sustained attention, impulsivity, hyperactivity, emotional control, and regulating her moods, and that these issues are "significantly interfering with her ability to function appropriately in the school setting." (Tr. 563-64).[27]

On November 17, 2011, LeVasseur, AM's teacher, completed a questionnaire in which she found that in the domain of acquiring and using information, AM had a serious problem with expressing ideas in written form, learning new material, and applying problem-solving skills in class discussions; an obvious problem in comprehending oral instructions, understanding and participating in class discussions, providing organized oral explanations

---

[27]At the time of the evaluation, Mroz did not have opinions from AM's teachers regarding her behavioral issues. (Tr. 562-63).

and adequate descriptions, and recalling and applying previously learned materials; and a slight problem with understanding school and content vocabulary, reading and comprehending written material, and comprehending and doing math problems. (Tr. 393).

She found that in the domain of attending and completing tasks, AM had an obvious problem which occurred hourly with organizing her own things or school materials; an obvious problem which occurred daily with focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out multi-step instructions, completing class/homework assignments, working without distracting herself or other, and working at a reasonable pace/finishing on time; a slight problem which occurred hourly with changing from one activity to another; and a slight problem that occurred daily with paying attention when spoken to directly, sustaining attention during play/sports, carrying out single-step instructions, waiting to take turns, and completing work accurately without careless mistakes. (Tr. 394). She explained that beginning in October of 2011, AM began using a daily behavior chart where she earned points based off of her behavior and set goals to be "on-task" and "responsible[;]" for the six weeks that AM had been using her chart, she had earned ninety-two percent of the possible points. (Tr. 395).

In the domain of interacting and relating with others, AM's teacher determined that she had a very serious problem which occurred hourly with introducing and maintaining relevant and appropriate topics of conversation; a serious problem which occurred hourly with relating experiences and telling stories; a serious problem which occurred daily with seeking attention appropriately; an obvious problem which occurred daily with taking turns in a conversation; a slight problem which occurred hourly with following rules; a slight problem which occurred weekly with making and keeping friends, asking permission

26

appropriately, and interpreting the meanings of facial expressions, body language, hints, and sarcasm; and no problems with playing cooperatively with other children, expressing anger appropriately, respecting/obeying adults in authority, using language appropriate to the situation and listener, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. 396). LeVasseur explained that AM was working on her social skills, with the goals of discussing appropriate topics with her peers instead of discussing private family and medical issues that are sensitive or inappropriate, remaining on topic during conversations, and appropriately sharing/discussing her feelings. (Tr. 398). She noted that AM was making "steady progress in comparison to last year's functioning[,]" and that she was becoming more aware of what was appropriate behavior. (Id.). She believed that AM was highly motivated to "be good" and that she was always polite and kind to her peers and the school staff. (Id.).

LeVasseur opined that in the domain of caring for herself, AM had a serious problem which occurred daily with identifying and asserting emotional needs with an appropriate degree of independence, responding appropriately to changes in her own mood, and using appropriate coping skills to meet daily demands of the school environment; an obvious problem which occurred weekly with calming herself when upset or overly excited and cooperating in, or being responsible for, taking needed medications; a slight problem which occurred weekly with handling frustration appropriately and being patient when necessary; and no problem with taking care of her personal hygiene, caring for her physical needs, using good judgment about personal safety, avoiding dangerous circumstances, and knowing when to ask for help. (Tr. 399). She noted that AM was working on personal responsibility with "organizing herself/materials, completing homework, returning homework and charts, etc.[,]"

27

but that to accomplish this "[s]he requires a lot of adult monitoring and reminders." (Id.).[28]

On December 3, 2012, Dr. Fuess completed a medical interrogatory (Tr. 673-79; see also Tr. 672) in which he diagnosed AM with PTSD, ADHD, and mood disorder, NOS, but opined that she did not meet or medically equal a listing because she did not have "[two] or more marked limitations under [the] 'B' criteria[.]" (Tr. 674, 676). He found that AM had less than marked limitations in acquiring and using information because, despite her need for special education in language arts and math, she had average test scores; had less than marked limitations in attending and completing tasks because, despite her ADHD, her teacher noted only "slight-obvious" problems and testing revealed an average working memory; had less than marked limitations interacting and relating with others because her behavior had "significantly improved[;]"[29] and had less than marked limitations in caring for herself because, while AM has had difficulty with managing her emotions and serious difficulty responding to changes in mood, her discharge plan also noted that she had no tantrums or physical aggression; she had no limitations in moving about and manipulating objects or in health and physical well being. (Tr. 677-78).

On August 29, 2013, Nancy Dicnizio, LPC, opined that AM had marked limitations in acquiring and using information because she struggled to understand information, such as chores not being a punishment and the fact that she should not discuss personal hygiene matters in detail; had marked limitations with attending and completing tasks because she

---

[28]On November 9, 2012, Stephen Bynum, an Outreach Support Worker, recounted that AM had attended eleven sessions of an educational support group between September 25 and December 11, 2008. (Tr. 655). While he noted that AM displayed a high degree of anxiety, was impulsive, and had difficulty keeping focused, he emphasized that the organization did not perform a medical, educational, or individual assessment of AM. (Id.).

[29]See note 13 supra.

required constant reminders and instruction and struggled with maintaining her focus and staying motivated when she was not interested; had marked limitations with caring for herself because her mother needed to prompt her to be neat, clean, and wear appropriate clothing, and if left alone she would play on the floor with "dirt, rocks, [and] critters/bugs" and needed to be reminded to wash her hands; and had extreme limitations with interacting with others because she struggled with appropriate boundaries, social cues, and skills and she would engage in inappropriate conversations with peers, struggled to understand how to start a conversation without seeming awkward, and would isolate herself and engage in non-age appropriate play. (Tr. 11). She noted that a new psychiatric evaluation had been scheduled for September 20, 2013. (Tr. 12).

In an undated form, Ephraim P. Bartfield, MD, opined that AM had marked limitations in acquiring and using information and taking care of herself, and extreme limitations in attending and completing tasks and interacting with others. (Tr. 41). He did not provide specific reasons for these opinions but stated generally that AM had "significant functional impairment in school[,] home, [and] social environments due to psychotic diagnoses" and that "[m]ultiple medical appointments [were] needed[.]" (Tr. 42).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported

by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537
F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see
also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would
accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson
v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106,
111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences
and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d
179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423
(S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh
evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala,
1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the
entire record to determine the reasonableness of the ALJ's factual findings.   See id.
Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence
and should be upheld even in those cases where the reviewing court might have found
otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d
Cir. 1997)(citation omitted).

        To determine if a child is disabled within the meaning of the Act, the ALJ must first
determine if and when the child last engaged in substantial gainful activity. See 20 C.F.R. §
416.924(b). Second, if, as in most cases, the child has not engaged in substantial gainful
activity, the ALJ must determine whether the child has an impairment or combination of
impairments that is severe within the meaning of the regulations. See 20 C.F.R. §
416.924(c). Third, and finally, if the child has a severe impairment of combination of
impairments, the ALJ must determine whether the child's impairment(s) meets or functionally

equals the severity of any disorder in the Listings, <u>see</u> 20 C.F.R. § 416.924(c), by determining whether the impairment(s) result in a "marked" limitation in two domains of functioning or an "extreme" limitation in one. <u>See</u> 20 C.F.R. § 416.926a(a).[30] The six domains to consider are the child's ability to (1) acquire and use information; (2) attend to and complete tasks; (3) interact with and relate to others; (4) move about and manipulate objects; and (5) care for oneself; and the child's (6) health and physical well-being. <u>See</u> 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

IV.  DISCUSSION

ALJ Zwecker concluded that AM was a school-age child who had not engaged in substantial gainful activity since May 2, 2011, the date of her application, and that she has the severe impairments of ADHD, major depressive disorder, and PTSD (Tr. 19; <u>see</u> 20 C.F.R. §§ 416.926a(g)(2), 416.924(b), 416.924(c)), but that these impairments, singly or in combination, do not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 19-34; <u>see</u> 20 C.F.R. §§ 416.924, 416.925, 416.926). Specifically, he determined that her impairments did not qualify under Listings 112.04 for mood disorders, 112.06 for PTSD, or 112.11 for ADHD (Tr. 19-27), and that AM has a less than marked limitation in acquiring and using information (Tr. 27-28), a less than marked limitation in attending and completing tasks (Tr. 28-30), a marked limitation in interacting and relating to others (Tr. 30-31), no limitation in moving about and manipulating objects (Tr. 31-32), a less than marked limitation in the ability to care for herself (Tr. 32-33), and no limitation in health and physical well-being (Tr. 32-33). Therefore, the ALJ concluded that

---

[30]A "marked" limitation seriously interferes with a child's ability to independently initiate, sustain, or complete activities, <u>see</u> 20 C.F.R. § 416.926a(e)(2), and an "extreme" limitation very seriously interferes with her ability to independently initiate, sustain, or complete activities. <u>See</u> 20 C.F.R. § 416.926a(e)(3).

AM has not been disabled since May 2, 2011, the date her application was filed. (Tr. 34-35).

Plaintiff argues that "[t]he ALJ's decision was not supported by 'substantial evidence' and did not fully credit assessments from all [of AM's] doctors and psychologist[s]. Furthermore, the ALJ did not consider the combination of impairments and did not properly evaluate the residual functional capacity of [AM]." (Dkt. #13, at 9-10). Specifically, plaintiff claims that the ALJ erred by not finding that AM met Listings 112.04 and 112.11 (id. at 11), and by not finding that her limitations were functionally equivalent to these Listings. (Id. at 11-13).[31] Plaintiff also references the opinions of Nancy Dicnizio and Dr. Ephraim Bartfield, both of which were completed after the ALJ's decision, and she argues that she was never provided a copy of Dr. Samson's written opinion. (Id. at 7-9; see also Dkt. #17, at 3-4). In response, defendant claims that AM's impairments did not meet or medically equal the requirements of any listed impairment (Dkt. #14, Brief at 5-7), and that AM's impairments were not functionally equivalent to any listed impairment. (Id. at 7-15).

## A. OPINIONS OF NANCY DICNIZIO AND DR. EPHRAIM BARTFIELD

Plaintiff's brief in support of her Motion to Reverse the Decision of the Commissioner relies heavily on the opinions of Nancy Dicnizio, LPC, and Ephraim P. Bartfield, MD (Dkt. #13, at 2, 8-9, 11-13); defendant's brief in support of her Motion to Affirm claims that the Appeals Council correctly found that this evidence did not meet the 20 C.F.R. § 405.401(c) criteria for consideration by the Appeals Council. (Dkt. #14, Brief at 14-15). In her reply brief, plaintiff argues that the Appeals Council erred by not considering this opinion and requests that the Court consider the evidence. (Dkt. #17, at 3-4). The Court will consider this evidence when

---

[31]In her motion and briefs, plaintiff does not challenge the ALJ's determination that AM did not meet Listing 112.06 or that she had no limitations in the domains of moving about and manipulating objects and health and physical well-being.

analyzing whether the ALJ's decision was supported by substantial evidence. <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner].") However, the Court finds that the Appeals Council did not commit an error of law when it found that the opinions did not meet the 20 C.F.R. § 405.401(c) criteria.[32]

Plaintiff claims that Dicnizio's letter meets the 20 C.F.R. § 405.401(c) criteria because it deserves to be afforded great weight (Dkt. #13, at 9), it relates to the time prior to the ALJ's decision, it supports the credibility of her own testimony, and it "alone could in fact change the outcome of the decision[.]" (Dkt. #17, at 4).[33]

---

[32]Plaintiff also notes that at the November 13, 2012 hearing, the ALJ informed her that Dr. Samson would have a chance to review all of the documents and create a written opinion which plaintiff would have an opportunity to review; however, this opinion does not appear in the record and plaintiff claims she never received a copy for review. (Dkt. #13, at 7; <u>see also</u> Tr. 62-63, 79). While the ALJ has a duty to fully develop the record, determining "[w]hether an ALJ [has] breached that duty in a particular case depends upon the totality of its facts and circumstances." <u>Leroy v. Colvin</u>, 84 F. Supp. 3d 124, 128 (D. Conn. 2015). Here, it is not clear whether Dr. Samson completed a medical opinion after the November 13, 2012 hearing; however, a supplemental hearing was held on July 2, 2013, at which Dr. Fuess, a new medical expert, testified. (Tr. 81-102). The ALJ read the information presented at the previous hearing into the record and gave plaintiff the chance to correct or elaborate on this information. (Tr. 84-88). Plaintiff provided additional information but did not correct the ALJ's recitation. (Tr. 88-90). Plaintiff also questioned Dr. Fuess and challenged his conclusions. (Tr. 96-101). Because Dr. Fuess received a recitation of the November 13, 2012 hearing testimony, to which plaintiff did not object, and because plaintiff had a chance to question and challenge Dr. Fuess' conclusions at the July 2, 2013 hearing, the omission of any report from Dr. Samson from the administrative transcript, and the fact that plaintiff was not given a chance to review such a report, does not constitute a failure of the ALJ to fully develop the record.

[33]Plaintiff's argument regarding the Appeals Council's rejection of Dr. Bartfield's opinion is less clear. She states that "the medication list on record support[s] medication consistency as well as the need for continuous increases and medication management as predicted by Dr. Samson[,]" and that AM and her issues "ha[ve] much to work on and will take time[.]" (Dkt. #17, at 4). The Court will still analyze the Appeals Council's choice to not consider this opinion under the criteria set forth in 20 C.F.R. § 405.401(c).

Under 20 C.F.R. § 405.401(c), "the Appeals Council will consider additional evidence only where it relates to the period on or before the date of the hearing decision, and only if [the claimant] show[s] that there is a reasonable probability that the evidence, alone or when considered with the other evidence of record, would change the outcome of the decision[.]" Additionally, Section 405.401(c) requires a claimant to show that she was misled by an agency action, suffered from "a physical, mental, educational, or linguistic limitation(s) that prevented [her] from submitting the evidence earlier[,]" or "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [her] from submitting the evidence earlier." Id. "Decisions of the Appeals Council refusing review are discretionary, and therefore 'may be reviewable to the extent that [the decision] rests on an explicit mistake of law or other egregious error.'" Orriols v. Colvin, No. 3:14 CV 863 (SRU/WIG), 2015 WL 5613153, at *2 (D. Conn. Sept. 24, 2015), quoting Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001), cert. denied, 534 U.S. 1085 (2002).

Dr. Bartfield's opinion is not dated and does not relate to the period on or before the ALJ's July 15, 2013 decision. (Tr. 41-42). While the opinion references AM's past "psychotic diagnoses" (Tr. 42), there is no evidence that Dr. Bartfield analyzed AM's condition prior to the ALJ's decision. Also, the sparse two page opinion includes no information about Dr. Bartfield's history with AM, such as when he began treating her or what information he relied on when rating her functional limitations. Without this information, the Court is not convinced that there is a "reasonable probability" that the inclusion of Dr. Bartfield's opinion would have changed the ALJ's decision. Because this opinion does not relate to the time before the ALJ's decision, and because Dr. Bartfield neither explains his assessments nor provides any information about his history with AM, the Appeals Council did not commit an "explicit

mistake of law or other egregious error" by determining that this evidence did not meet the criteria of 20 C.F.R. § 405.401(c).

Similarly, Dicnizio's opinion focuses on AM's functional abilities at the time of the report and does not contain a retrospective analysis of her conditions prior to the ALJ's decision. (Tr. 11-12).[34] Even if this opinion related back to the relevant time period, plaintiff has not shown "that there is a reasonable probability that the evidence, alone or when considered with the other evidence of record, would change the outcome of the decision[.]" 20 C.F.R. § 405.401(c). Plaintiff claims that Dicnizio's opinion is "supported . . . by her progress notes" (Dkt. #13, at 9); however, neither these notes, nor any other evidence of the extent of Dicnizio's treatment relationship with AM, appear in the record. Rather, plaintiff's brief implies that AM began her treatment with Dicnizio at IICAPS after the July 2, 2013 hearing (Dkt. #17, at 4 ("ALJ [] was informed that [AM] will be seeking a higher level of care with an I[I]CAPS team . . .")(emphasis added)), meaning that, at the time of her August 29, 2013 opinion, Dicnizio had likely been treating AM for, at most, less than eight weeks, and would have limited experience with her limitations prior to the July 15, 2013 decision. Because Dicnizio's opinion does not relate back to the period before the ALJ's decision, and because the Court can not conclude that "there is a reasonable probability that th[is] evidence . . . would change the outcome of the [ALJ's] decision[]" 20 C.F.R. § 405.401(c), the Appeals Council did not make an "explicit mistake of law or other egregious error" when it determined that this evidence did not meet the criteria of 20 C.F.R. § 405.401(c). However, as discussed above, the Court will consider these opinions in its

---

[34]While plaintiff correctly points out that Dicnizio is a counselor for IICAPS and that plaintiff informed the ALJ at the hearing that AM had been referred to IICAPS (Dkt. #17, at 3-4; see also Tr. 96), there is still no indication that Dicnizio was opining on AM's condition prior to the ALJ's decision. (Tr. 11-12).

analysis of whether the ALJ's opinion was supported by substantial evidence. See Perez, 77 F.3d at 46.

### B. LISTINGS ANALYSIS

Plaintiff claims that AM's impairments meet the requirements of Listings 112.04 for Mood Disorder and 112.11 for ADHD. (Dkt. #13, at 11).[35] In order to qualify under either of these Listings, AM must satisfy the Paragraph A criteria, which is unique to each Listing, and the Paragraph B criteria, which is identical for both Listings. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B §§ 112.04, 112.11. The Paragraph B criteria require a showing that AM experienced at least two of the following: marked impairment in age-appropriate cognitive/communicative function, marked impairment in age-appropriate social functioning, marked impairment in age-appropriate personal functioning, or marked difficulties in maintaining concentration, persistence, or pace. Id. at §§ 112.04(B), 112.11(B).

The ALJ's analysis of AM's failure to meet a Listed impairment was terse. He found that "[b]ased upon the testimony and medical evidence of record, . . . [AM] does not meet [L]istings 112.04, 112.06, 112.11, or any other [L]isting." (Tr. 19). In making this finding, the ALJ relied upon Dr. Fuess' opinion that AM did not satisfy the Paragraph B criteria of any Listing (Tr. 20 ("With regard to meeting or medically equaling" a Listing, AM "did not have two or more marked limitations.")), and "considered the severity of [AM's] impairments in light of the medical evidence of record[,]" the "opinions of the treating physicians[, and] the opinions of the state agency medical consultants" before concluding that AM "does not satisfy the requirements of the [L]istings, as [she] does not have the requisite mental deficits." (Tr. 21).

---

[35]See note 31 supra.

While an ALJ "'should set forth a sufficient rationale in support of his decision to find or not find a listed impairment,' the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" Salimini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010), quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).

Plaintiff claims that AM meets the requirements of Listing 112.04 because her major depressive syndrome is characterized by sleep disturbance, feelings of worthlessness, difficulty thinking or concentrating, and paranoid thinking. (Dkt. #13, at 11). Alternatively, she claims that AM's manic syndrome meets the criteria because it includes irritable mood as well as a decreased need for sleep, easy distractibility, and hallucinations and paranoid thinking; she does not address whether or not AM satisfies the Paragraph B criteria. (Id.). Plaintiff also claims that AM "meets the requisite deficits for [Listing] 112.11 for attention deficit hyperactivity disorder and satisfies [this] listing[] based on [] medically documented findings of marked impulsiveness, marked hyperactivity and marked inattention resulting in at least two of the age appropriate []criteria in [Paragraph] B of 112.02." (Id.).

Even assuming that AM met the Paragraph A criteria for either Listing, which is not clear, plaintiff has failed to show that the ALJ's conclusion that AM failed to meet the Paragraph B criteria was not based on substantial evidence. The ALJ's opinion includes a thorough discussion of AM's treatment and educational history (Tr. 22-27) and he based his conclusion that AM did not meet the Paragraph B criteria on the opinions of three consultative physicians who determined that AM did not meet or medically equal a Listing. (Tr. 20-21); see also Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012)(finding

that an ALJ may rely on the report of a State Agency consultant who "was the only expert of record who specifically assessed whether [plaintiff's] impairment met or equaled a listed impairment[]"). Therefore, the Court concludes that the ALJ's decision that AM did not meet or medically equal a Listing was supported by substantial evidence.

### C. FUNCTIONAL EQUIVALENCE ANALYSIS

Plaintiff also claims that the ALJ erred when he found that AM's impairments did not functionally equal a Listed impairment. (Dkt. #13, at 11-13). A claimant functionally equals a Listing when her impairments result in "'marked' limitations in two[, ] or an 'extreme' limitation in one[,]" of the six domains of functioning. 20 C.F.R. § 416.926a(a); see also 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Plaintiff argues that AM's impairments result in marked limitations in her ability to acquire and use information, marked or extreme limitations in her ability to attend and complete tasks, extreme limitations in her ability to interact and relate with others, and marked limitations in her ability to care for herself; she does not dispute the ALJ's findings concerning AM's ability to move and manipulate objects and her health and physical well-being. (Dkt. #13, at 11-13).[36]

The Court reminds plaintiff that it "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess, 537 F.3d at 127, quoting Shaw, 221 F.3d at 131. Also, if there is substantial evidence to support the Commissioner's decision, then that decision "must be upheld even if substantial evidence supporting plaintiff's position also exists." Cardoza v. Astrue, 3:10 CV 1951 (MRK)(WIG), 2012 WL 3727160, at *1 (D.

---

[36]In her brief, plaintiff makes multiple references to an unsigned, undated, and incomplete opinion which it appears she wrote herself (Dkt. #13, at 11-12, citing Tr. 656-62; see also note 14 supra); the Court will not consider this opinion in its analysis.

Conn Apr. 13, 2012), citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

### 1. DOMAIN OF ACQUIRING AND USING INFORMATION

Plaintiff claims that the ALJ erred when he found that AM had a less than marked limitation in her ability to acquire and use information. (Dkt. #13, at 11-12). In support of her argument, plaintiff cites the opinions of Brown, LeVasseur, Halstead, and Metz. (Id.). However, the ALJ specifically found that none of these opinions supported a finding of marked or extreme limitations in any domain of functioning; he also discounted any opinions from 2008, like that of Metz, because AM had not yet received treatment or medication management. (Tr. 26). Plaintiff also references AM's GAF scores and continual medication adjustments, denies that AM's symptoms were controlled by the medications, and claims that both Dicnizio and Dr. Bartfield found that AM had a more severe level of impairment in this domain. (Dkt. #13, at 11-12).

In reaching his decision, the ALJ acknowledged plaintiff's testimony as well as many of the opinions and reports which plaintiff references in her brief. (Tr. 27-28). He discussed AM's medication regime to treat her ADHD and was aware that it had not resolved her behavioral problems in school; he also referenced that she continued to display hyperactivity, impulsivity, and limited self control which interfered with her ability to function appropriately in the school setting, that her school psychologist and third grade teacher both noted problems with her ability to acquire and use information, and that she received special education in multiple subjects in school as well as counseling. (Tr. 28). However, when deciding that she had a less than marked limitation in this domain, the ALJ relied upon reports from AM's teachers that she had been making progress, that her math scores were almost average, that her reading scores were above average, that her cognitive processing

abilities were consistently average, and that her verbal reasoning abilities, nonverbal reasoning abilities, short term, and long term memory were all average. (Id.). He also relied on the opinions of the medical expert, Dr. Fuess, and the non-examining state agency psychologists, Drs. Augenbraun and Leib, who all determined that AM had less than marked limitations in acquiring and using information. (Id.); see also 20 C.F.R. § 416.927(e)(2)(i)(noting that while ALJ's are not bound by any findings made by State agency consultants, these consultants are still "highly qualified . . . specialists who are also experts in Social Security disability evaluation."). Therefore, the ALJ's decision in this domain was supported by substantial evidence.

## 2. DOMAIN OF ATTENDING AND COMPLETING TASKS

Plaintiff also claims that the ALJ erred when he found that AM had a less than marked, rather than a marked or extreme limitation in her ability to attend and complete tasks. (Dkt. #13, at 12-13). In making this argument, plaintiff references the opinions of Dicnizio and Dr. Bartfield, and relies heavily on the psychological evaluation performed by Mroz on September 22, 2011. (Id.). However, the ALJ discussed Mroz's opinion, assigned it "some weight[]" (Tr. 26), and considered it when making his determination. (Tr. 28-30). Additionally, when making his decision, the ALJ relied upon reports that AM was making progress in school, that her test scores were mostly average, and that Drs. Fuess, Augenbraun, and Leib all found that she had a less than marked impairment in this domain. (Tr. 29-30). Therefore, the Court finds that there was substantial evidence to support the ALJ's decision regarding this domain.

## 3. DOMAIN OF INTERACTING AND RELATING WITH OTHERS

Plaintiff argues that the ALJ erred by finding that AM suffered from a marked, rather

than an extreme, limitation in interacting and relating with others. In making this argument, plaintiff relies on the opinions of Dicnizio and Dr. Bartfield, who both opined that AM had an extreme limitation in this domain. (Dkt. #13, at 13). When making his decision, the ALJ discussed AM's difficulties interacting with other people, such as her difficulties making and keeping friends, her sexually inappropriate behavior, and her restriction from having sleepovers or play dates, but also noted that she was making progress and that her third grade teacher had noted primarily slight limitations in interacting and relating with others. (Tr. 30-31). He also considered the opinion of Dr. Fuess that AM had a marked limitation and the opinions of Drs. Augenbraun and Lieb that she had a less than marked limitation in this domain. (Id.). Therefore, the ALJ's decision that AM suffered from a marked limitation in this domain was supported by substantial evidence.

### 4. DOMAIN OF CARING FOR HERSELF

Finally, plaintiff argues that the ALJ erred when finding that AM had a less than marked limitation in her ability to care for herself. (Dkt. #13, at 13).[37] Plaintiff claims that

---

[37]This domain focuses on a child's ability to maintain a healthy emotional and physical state, including satisfying her physical and emotional wants and needs in an appropriate way, coping with stress and changes in the environment, and taking care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k); Social Security Ruling ["SSR"] 09-7p, 2009 WL 396029, at *2 (S.S.A. Feb. 17, 2009). However, this domain "does not address [a child's] physical abilities to perform self-care tasks like bathing, getting dressed, or cleaning up [her] room[,]" instead, it focuses on "how well a child relates to [her]self by maintaining a healthy emotional and physical state in ways that are age appropriate and in comparison to other same-age children who do not have impairments." SSR 09-7p, at *2. This domain is related to the domain of "Interacting and Relating with Others" but focuses on a claimant's behaviors in relation to herself rather than her relation to other people. Id. at *4. Some examples of limited functioning in this domain include (i) placing non-nutritive or inedible objects in the mouth; (ii) using self-soothing activities that are developmentally regressive (e.g. thumbsucking); (iii) being unable to dress or bathe age appropriately; (iv) engaging in self-injurious behavior or ignoring safety rules; (v) not being able to spontaneously pursue enjoyable activities or interests; and (vi) having disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3); SSR 09-7p, at *6. However, these "are not the only examples of limitations in this domain, nor do they necessarily describe a 'marked' or an 'extreme' limitation." SSR 09-7p, at *6.

the ALJ's decision was not "supported by 'substantial evidence' and did not fully credit assessments from all doctors and psychologists." (Id.).

At the hearing, plaintiff challenged Dr. Fuess regarding his opinion that AM had less than marked limitations in this domain. (Tr. 97-99). She correctly observed that Dr. Fuess' written interrogatory stated that AM's discharge summary from the EDT program at the Wheeler Clinic noted "no tantrums[ and] no physical aggression[]" (Tr. 99-101, 678), when in fact, the discharge summary stated that AM had "[n]o physical aggression[ and] no tantrums[]" at her appointments, but at home AM was "quick to escalate to rudeness, tantrums[,]" engaged in "[s]ome physical hitting toward her sister," and "still respond[ed] with aggression to [her] older brother's verbal instigations." (Tr. 607). However, at the hearing, Dr. Fuess learned of AM's continued tantrums and physical aggression but still opined that AM had a less than marked limitation in caring for herself; therefore any error resulting from Dr. Fuess' earlier beliefs about the frequency of AM's tantrums was rendered harmless. (Tr. 97).

Additionally, while plaintiff cites to some information that the ALJ did not explicitly reference in his opinion, such as AM eating non-edible objects and having difficulty sleeping (Dkt. # 13, at 13), an ALJ "is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered[.]" See Dwyer v. Astrue, 800 F. Supp. 2d 542, 548 (S.D.N.Y. 2011)(citations omitted). Here, the ALJ provided a thorough summary of the AM's treatment history, educational history, and the opinion evidence. (Tr. 22-27). While the ALJ did not reference all of AM's behaviors, such as eating non-edible objects and having difficulty sleeping, these behaviors do not "necessarily describe a 'marked' or an 'extreme' limitation." SSR 09-7p, at *6. Therefore, despite the

evidence that plaintiff has presented regarding AM's limitations in this category, the ALJ's decision was supported by substantial evidence.

### V. CONCLUSION

Plaintiff's concern for her child is admirable, and AM is indeed blessed to have such an attentive and devoted parent.  However, the new records do not relate back to the time before the ALJ's decision and his decision is supported by substantial evidence. Therefore, for the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #13) is **denied**, and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #14) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 27th day of January, 2016.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge